# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| GREGORY MORAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. N24C-11-005 PAW CCLD |
| | ) | |
| ZOOMCAR INDIA PRIVATE | ) | |
| LIMITED, ZOOMCAR HOLDINGS, | ) | |
| INC., STERNAEGIS VENTURES | ) | |
| FUND I, LP, and AEGIS CAPITAL | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

Date Submitted: August 15, 2025
Date Decided: November 20, 2025

## <u>MEMORANDUM OPINION</u>

*Upon the Zoomcar Defendants' Motion to Dismiss;*
**GRANTED, in part and DENIED, in part.**

*Upon the Aegis Defendants' Motion to Dismiss;*
**GRANTED, in part and DENIED, in part.**

Timonthy M. Holly, Esq.; and Anna Brousell, Esq., of Connolly Gallagher, LLP; Ralph N. Sianni, Esq., of Andersen Sleater Sianni LLC, *Attorneys for Plaintiff Gregory Moran.*

Christopher J. Day, Esq., of Day Law Group, LLC; and Christopher P. Milazzo, Esq., of Sichenzia Ross Ference Carmel LLP, *Attorneys for Defendants Zoomcar India Private Limited and Zoomcar Holdings, Inc.*

David Holloway, Esq., of Holloway Law LLC; Richard A. Roth, Esq.; and Brian Levenson, Esq., of The Roth Law Firm, PLLC, *Attorneys for Defendants Sternaegis Ventures Fund I, LP and Aegis Capital Corporation.*

**WINSTON, J.**

# I. **INTRODUCTION**

Plaintiff is the founder of a business called "Zoomcar," and he served as CEO of two Zoomcar entities who are defendants here. One of those entities is Zoomcar India, which operates the Zoomcar business in India. The other is Zoomcar Holdings, which is Zoomcar India's parent company. Plaintiff's Complaint presents the following narrative: the other two defendants, the Aegis Defendants, took control of the Zoomcar business when it was financially vulnerable. To benefit themselves and consolidate their control, the Aegis Defendants took actions that were harmful to the business. Plaintiff criticized those actions, tensions rose, and Zoomcar found itself in financial turmoil again. In retaliation to his criticisms, the Aegis Defendants wielded their control to terminate Plaintiff's employment and deprive him of long-promised benefits memorialized in his Employment Agreement.

Plaintiff seeks to recover these benefits under a variety of theories. In Count I, he asserts a claim for breach of the Employment Agreement (and the implied covenant) against his contractual counterparty, Zoomcar India. In Count II, he brings a claim for breach of New York's labor laws against all Defendants. In Count III, he advances three quasi-contract theories against all Defendants. In Count IV, he asserts claims for tortious interference with contract and business relations against Zoomcar Holdings and the Aegis Defendants. And in Count V, he seeks a declaratory judgment regarding his rights under the Employment Agreement.

2

Defendants have moved to dismiss all counts except Count I. The Court previously dismissed Count III. Sorting through the rest of the parties' arguments, the claims that remain after this decision are: (i) breach of contract and the implied covenant against Zoomcar India; (ii) tortious interference with contract against Zoomcar Holdings and one of the Aegis Defendants; and (iii) declaratory judgment against the Zoomcar Defendants and one of the Aegis Defendants.

## II.   FACTUAL AND PROCEDURAL BACKGROUND[1]

### A.   PLAINTIFF FOUNDS ZOOMCAR AND FORMS CERTAIN OF THE ENTITIES THAT COMPRISE IT.

In 2012, Plaintiff formed two entities that are part of the business he founded and calls "Zoomcar."[2]  First, he formed Zoomcar, Inc., which later became Defendant Zoomcar Holdings, Inc., a Delaware corporation ("Zoomcar Holdings").[3] Then, he formed Defendant Zoomcar India Private Limited, an Indian private limited

---

[1] The facts are drawn from the Complaint and the documents incorporated therein. The Court accepts as true the well-pled facts in the Complaint solely for the purposes of defendants' motions to dismiss.

[2] Compl. ¶¶ 12, 14-15.  This opinion at times refers to "Zoomcar," either when it means the Zoomcar business generally rather than a particular entity or when the pleading does not specify the Zoomcar entity to which it is referring.

[3] *Id.* ¶ 14.  The Court refers to this entity as "Zoomcar Holdings" throughout this opinion for convenience, acknowledging that it may not have been called that at the time of certain early events.

company registered in Karnataka, India ("Zoomcar India," and with Zoomcar Holdings, the "Zoomcar Defendants").[4]

Zoomcar India is the Zoomcar entity that operates within India.[5] Zoomcar Holdings is Zoomcar India's parent company, with Zoomcar Holdings "controlling critical decisions tied to capital structure, budgeting, corporate transactions, and personnel operating Zoomcar India."[6]

At the time of its formation, Plaintiff owned about 50% of Zoomcar Holdings' stock.[7] After the business became operational, institutional investors provided funding, and in 2016 Plaintiff's equity in Zoomcar Holdings decreased to about 8%.[8] Plaintiff has at various times served as the CEO and a director of each of Zoomcar India and Zoomcar Holdings.[9]

---

[4] *Id.* ¶ 15.

[5] *Id.*

[6] *Id.* ¶¶ 15-16.

[7] *Id.* at ¶ 15.

[8] Compl. ¶ 22.

[9] *See id.* ¶¶ 3, 17, 68.

**B.** **ZOOMCAR STRUGGLING FINANCIALLY, THE AEGIS DEFENDANTS TAKE CONTROL AND TAKE ACTIONS THAT PLAINTIFF CONTENDS DAMAGED THE BUSINESS, INCLUDING PUSHING IT INTO A SPAC**

In 2020, COVID-19 caused significant financial strain on the Zoomcar business.[10]  At risk of defaulting on its debt and other obligations, Zoomcar determined to raise additional financing.[11]  Defendants Aegis Capital Corporation ("Aegis Capital") and Sternaegis Ventures Fund I, LP ("Sternaegis," and with Aegis Capital, the "Aegis Defendants," and both with the Zoomcar Defendants, "Defendants") eventually provided this financing.[12]  Plaintiff alleges that the Aegis Defendants obtained more favorable terms for themselves in the financing by strategically delaying to exploit Zoomcar's precarious financial situation.[13]  Under the terms they negotiated, the Aegis Defendants took "effective control" of Zoomcar India through Zoomcar Holdings.[14]

---

[10] *Id.* ¶ 28.

[11] *Id.* ¶¶ 29-32.

[12] *Id.* ¶ 2.

[13] *See id.* ¶¶ 33-34.

[14] Regarding the point in the corporate structure through which the Aegis Defendants exerted control, Plaintiff alleges that Zoomcar Holdings controlled Zoomcar India and that the Aegis Defendants exerted control over "Zoomcar" and "Zoom India" (*see* Compl. ¶¶ 2, 15-16, 34-35).  From these allegations, the Court infers that the Aegis Defendants controlled Zoomcar Holdings, through which they controlled Zoomcar India.  If, however, Plaintiff is aware that this is incorrect—and the Aegis Defendants did not control Zoomcar Holdings but instead exerted any control directly over Zoomcar India only—Plaintiff should correct his pleading promptly. This inference affects the Court's ruling on the tortious interference with contract

Plaintiff alleges that the Aegis Defendants wielded their control to the detriment of Zoomcar's business and for their own benefit.[15] In particular, the Aegis Defendants pushed for an overhaul of the Zoomcar corporate structure and to go public through a SPAC transaction, which Plaintiff contended was premature.[16] To support the process of moving toward a SPAC, Zoomcar sought to raise additional capital.[17] The Aegis Defendants imposed terms on that capital raise to thwart outside investment.[18] That left Zoomcar with "no other choice" but to agree to raise capital from insiders associated with the Aegis Defendants at terms that "stripped away approximately 99% of the equity held by other investors."[19] In addition, the Aegis Defendants pushed for outsized payments to the directors they had appointed to "reward [the directors] for advancing the Aegis Defendants' self-serving interests" and threatened to withhold further capital contributions if Plaintiff did not agree.[20]

Plaintiff alleges that his communications with the Aegis Defendants concerning certain of their actions indicated that he "had become a target for

---

claim against Zoomcar Holdings. Plaintiff is entitled to friendly inferences from in-artfully pled facts; Plaintiff is not entitled to deliberate obfuscation.

[15] *See id.* ¶ 37.

[16] *Id.* ¶¶ 38, 42.

[17] *Id.* ¶ 53.

[18] *Id.*

[19] Compl. ¶ 54.

[20] *See id.* ¶¶ 44-47.

termination" and that the Aegis Defendants had become "hostile" toward him due to his disagreements with them.[21]

### C. PLAINTIFF AND ZOOMCAR INDIA ENTER INTO THE EMPLOYMENT AGREEMENT, AND THE SPAC CLOSES.

As Zoomcar proceeded toward closing the SPAC, Plaintiff and Zoomcar India entered into an Amended and Restated Employment Agreement, dated December 22, 2023 (the "Employment Agreement").[22] The Employment Agreement provides that Plaintiff would continue to serve as CEO of Zoomcar India and also serve as CEO of Zoomcar Holdings.[23] It further provides that Plaintiff's "Principal Place of Employment" would be in India—specifically at "Zoomcar India Pvt. Ltd, Ground Floor, Enzyme Tech Park, #4 Building, Domlur Service Road, 13, HAL Old Airport Road, Domlur 1st Stage, ISRO Colony Bengaluru, Karnataka 560071"—and that Plaintiff "may be relocated to other locations either at Bangalore or elsewhere in India."[24]

The Employment Agreement also sets forth the compensation Plaintiff would receive for his services.[25] Among other things, the Employment Agreement provides

---

[21] *See id.* ¶¶ 40, 51.

[22] *See* Compl., Ex. A (hereinafter "Employment Agreement").

[23] Compl. ¶ 68; Employment Agreement § 1.

[24] Employment Agreement § 3.

[25] *Id.* § 4, Annex. A.

that Plaintiff "will be eligible for a one-time payment amount of USD. 100,000 . . . which will be paid on the 6-month anniversary of" the closing of the SPAC merger (the "$100,000 Payment").[26] Further, the Employment Agreement provides for circumstances in which Plaintiff would be "granted restricted stock units equal to 8% of the aggregate number of [Zoomcar] Holdings common shares issued and outstanding immediately after the Business Combination (after giving effect to the redemption)" and sets forth a vesting schedule for those restricted stock units (the "8% Equity Grant").[27] The grant of those restricted stock units is "[s]ubject to the approval of the compensation committee of the [Zoomcar] Holdings Board and approval of the Zoomcar Holdings, Inc. 2023 Equity Incentive Plan by IOAC's shareholders."[28]

The Employment Agreement further sets forth circumstances in which Zoomcar India may terminate Plaintiff's employment, either "with Cause" or "without Cause."[29] It provides for the acceleration of certain unvested equity awards in the event Plaintiff is terminated without Cause, specifically:

---

[26] *Id.*, Annex A § 2; Compl. ¶ 74.

[27] Employment Agreement, Annex. A § 3.

[28] *Id.* "IOAC" is defined to mean Innovative International Acquisition Corp., the blank-check company with which Zoomcar Holdings merged as part of the SPAC. *See id.*, Whereas Clause ¶ B.

[29] *See id.* § 7(a).

8

> In the event that [Plaintiff's] Employment is terminated without Cause, [Plaintiff's] then-unvested equity awards that vest based solely on the passage of time shall be accelerated, such that all such then-unvested time-based equity awards shall vest and become fully exercisable or non-forfeitable as of Employee's termination date.[30]

In addition, the Employment Agreement contains a choice-of-law clause choosing Delaware law to govern "[t]his Agreement and any controversy arising out of or relating to this Agreement."[31] In full, that clause provides:

> <u>Governing Law</u>. This Agreement and any controversy arising out of or relating to this Agreement shall be governed by the internal law of the State of Delaware, without giving effect to principles of conflicts of law.[32]

Around the time Plaintiff and Zoomcar India entered into the Employment Agreement and before the SPAC closed, the Aegis Defendants "made additional last-minute demands on Zoomcar by insisting on a further 'resetting' of the original cost basis for the Aegis Defendants' investor group."[33] Ultimately, the SPAC closed on December 29, 2023.[34]

---

[30] *Id.* § 7(a)(ii).

[31] Employment Agreement § 17.

[32] *Id.*

[33] Compl. ¶ 58.

[34] *See id.* ¶¶ 74, 76.

**D.** **POST-SPAC ZOOMCAR FACES MORE FINANCIAL TURMOIL, AND PLAINTIFF IS TERMINATED WITHOUT RECEIVING CERTAIN BENEFITS.**

After the SPAC closed, Zoomcar faced renewed financial turmoil, and the Aegis Defendants took further action that Plaintiff contends damaged the business. Shortly after the closing, "the Aegis Defendants initiated litigation against Zoomcar."[35] That lawsuit "exposed Zoomcar to legal expense it could not shoulder" and to "immediate negative public perception" that "ma[de] raising essential funding and sustaining operations even more difficult, if not impossible."[36]

Zoomcar Holdings' stock price dropped to below $1 per share, from the $10 per share price when it went public through the SPAC.[37] By May 2024, the stock was "trading consistently at approximately $.15 per share" and Zoomcar needed to raise capital to stave off bankruptcy.[38] Plaintiff attempted to raise outside capital, but those efforts fell through.[39] Zoomcar had little choice but to raise additional capital from the Aegis Defendants or face bankruptcy.[40] The Aegis Defendants made

---

[35] *Id.* ¶ 77.

[36] *Id.*

[37] *Id.* ¶ 79.

[38] *See* Compl. ¶¶ 80-81.

[39] *See id.* ¶¶ 82-83.

[40] *See id.* ¶¶ 80-81, 83-85.

a proposal to raise up to $3 million "as an immediate stop gap with a more substantive funding" to follow.[41]

The Aegis Defendants initially conditioned their funding on "Plaintiff's ouster from the company."[42] After further discussion with a company advisor, the Aegis Defendants "agreed not to oust Plaintiff" but that he would need to take on "a different, non-executive role within Zoomcar without any control over budgetary matters or future Zoomcar fundraising."[43]

The parties discussed the potential for Plaintiff to take on a different role, but those discussions proved unfruitful.[44] To continue his employment with Zoomcar, Defendants "demanded that Plaintiff waive and release all pre-existing contractual rights."[45] Plaintiff refused and sought different terms, and on June 19, 2024, his employment was terminated, purportedly "for cause."[46]

After his termination, Plaintiff sought payments he claims are due under the Employment Agreement. These include the 8% Equity Grant and the $100,000

---

[41] *Id.* ¶ 85.

[42] *Id.* ¶ 86.

[43] Compl. ¶ 87.

[44] *See id.* ¶¶ 87-89, 96-97.

[45] *Id.* ¶ 94.

[46] *Id.* ¶¶ 91, 96-97.

11

Payment.[47]    Plaintiff has also sought payments under Indian law, including a "gratuity" under "India's Payment of Gratuity Act" and "leave encashment" under "the Karnataka Shops and Commercial Establishments Act, 1961."[48]

Zoomcar India has not made payments that Plaintiff has demanded.[49]  Plaintiff alleges that he has not committed any act that could constitute "Cause" under the Employment Agreement and that Defendants "disingenuously concocted" "Cause" in an effort to avoid the restricted stock units in the 8% Equity Grant from "becoming immediately . . . vested and fully exercisable and non-forfeitable."[50]  He further alleges that Defendants had informed him that the board and stockholder "approval" referenced in the 8% Equity Grant clause "were either non-issues or would be imminently fulfilled" but that Defendants stalled so that those approvals would not take place to avoid having to issue the 8% Equity Grant.[51]  The Complaint also alleges that Plaintiff was terminated "just days before the $100,000 payment was due" and that Zoomcar India failed to make that payment when due.[52]

---

[47] *See id.* ¶¶ 116, 118, 122-23.

[48] Compl. ¶¶ 120, 133-35.

[49] *Id.* ¶¶ 116-20.

[50] *Id.* ¶¶ 114-15, 172.

[51] *See id.* ¶¶ 66, 78.

[52] *Id.* ¶¶ 96, 116.

### E. PROCEDURAL HISTORY

Plaintiff filed his Complaint on November 1, 2024.[53] The Complaint contains five counts, some of which include multiple theories of recovery: Count I against Zoomcar India for breach of the Employment Agreement and the implied covenant;[54] Count II against all Defendants for breach of New York labor law;[55] Count III against all Defendants under various quasi-contract theories;[56] Count IV against Zoomcar Holdings and the Aegis Defendants for tortious interference with the Employment Agreement and business relations;[57] and Count V for a declaratory judgment regarding Plaintiff's rights under the Employment Agreement.[58]

The Aegis Defendants moved to dismiss all claims against them, contending, first, that the Court lacks personal jurisdiction over Aegis Capital and, second, that Counts II, III, IV, and V fail to state a claim.[59] The Zoomcar Defendants moved to dismiss Counts II, III, and IV for failure to state a claim.[60] Plaintiff filed two answering briefs, one responding to the Aegis Defendants and the other to the

---

[53] *See generally id.*

[54] *See* Compl. ¶¶ 127-47.

[55] *See id.* ¶¶ 148-56.

[56] *See id.* ¶¶ 157-66.

[57] *See id.* ¶¶ 167-75.

[58] *See id.* ¶¶ 176-82.

[59] *See* D.I. 15 (hereinafter "Aegis Op. Br.").

[60] *See* D.I. 11; D.I. 16 (hereinafter "Zoomcar Op. Br.").

13

Zoomcar Defendants.[61] The Aegis Defendants and Zoomcar Defendants each filed replies.[62]

On April 29, 2025, the Court held oral argument, after which it granted Defendants' motions to dismiss Count III on the record and reserved its decision on the remainder of the motions.[63] At the request of the Court, on August 15, 2025, the parties filed supplemental submissions regarding a choice-of-law issue.[64]

What remains of the motions are: (i) the Aegis Defendants' motion to dismiss all claims against Aegis Capital under Rule 12(b)(2); (ii) all Defendants' motions to dismiss Counts II and IV under Rule 12(b)(6); and (iii) the Aegis Defendants' motion to dismiss Count V under Rule 12(b)(6).

## III. STANDARDS OF REVIEW

When a defendant invokes Rule 12(b)(2) to seek a complaint's dismissal for lack of personal jurisdiction, "[t]he plaintiff has the burden to show a basis for the Court's jurisdiction over the nonresident defendant."[65] In determining whether a plaintiff has met this burden, the Court engages in a two-pronged inquiry: first, it

---

[61] *See* D.I. 17 (hereinafter "Ans. Br. to Aegis Mot."); D.I. 26.

[62] *See* D.I. 27 (hereinafter "Zoomcar Reply"); D.I. 28.

[63] *See* D.I. 40.

[64] *See* D.I. 47; D.I. 48 (hereinafter "Pl. Supp. Br."); D.I. 49.

[65] *Terramar Retail Ctrs., LLC v. Marion #2-Seaport Trust U/A/D/ June 21, 2002*, 2017 WL 3575712, at *4 (Del. Ch. Aug. 18, 2017) (quoting *Sprint Nextel Corp. v. iPCS, Inc.*, 2008 WL 2737409, at *5 (Del. Ch. July 14, 2008)).

14

must "determine that service of process is authorized by statute," and "then must determine that the exercise of jurisdiction over the nonresident defendant comports with traditional due process notions of fair play and substantial justice."[66] The plaintiff has the burden to prove that these two steps are satisfied as to each defendant.[67] "If, as here, no evidentiary hearing has been held, [the] plaintiff[] need only make a *prima facie* showing of personal jurisdiction, and 'the record is construed in the light most favorable to the plaintiff.'"[68]

Upon a motion to dismiss under Rule 12(b)(6), the Court (i) accepts all well-pled factual allegations as true, (ii) accepts even vague allegations as well-pled if they give the opposing party notice of the claim, (iii) draws all reasonable inferences in favor of the non-moving party, and (iv) only dismisses a case where the plaintiff would not be entitled to recover under any reasonably conceivable set of

---

[66] *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007) (citations omitted).

[67] *CLP Toxicology, Inc. v. Casla Bio Hldgs. LLC*, 2020 WL 3564622, at \*10 (Del. Ch. June 29, 2020).

[68] *Ryan*, 935 A.2d at 265 (first citing *Benerofe v. Cha*, 1996 WL 535405, at \*3 (Del. Ch. Sept. 12, 1996); and then quoting *Cornerstone Techs., LLC v. Conrad*, 2003 WL 1787959, at \*3 (Del. Ch. Mar. 31, 2003)).

circumstances.[69]  The Court does not, however, accept conclusory allegations that lack specific supporting factual allegations.[70]

## IV.  ANALYSIS

This opinion analyzes the remaining aspects of Defendants' motions to dismiss in five parts: First, the Court addresses a threshold jurisdictional argument, whether the Court has personal jurisdiction over Aegis Capital.  Second, it examines the Aegis Defendants' argument that the Complaint fails to state any claims against Sternaegis because the Complaint's allegations "lump" Sternaegis together with other Defendants.  Third, the Court explores whether it may apply New York labor law in Count II.  Fourth and fifth, the Court considers if Count IV states a claim for tortious interference with contract or business relations and if Count V states a claim for declaratory judgment.

### A.    THE COURT LACKS PERSONAL JURISDICTION OVER AEGIS CAPITAL.

The Aegis Defendants contend that the  Court lacks personal jurisdiction over Aegis Capital, a New York corporation.[71]  Plaintiff seeks to invoke jurisdiction under three theories: (i) application of the Employment Agreement's forum selection

---

[69] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs., LLC*, 27 A.3d 531, 535 (Del. 2011) (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002)).

[70] *Ramunno v. Cawley*, 705 A.2d 1029, 1034 (Del. 1998) (citing *In re Tri-Star Pictures, Inc., Litig.*, 634 A.2d 319, 326 (Del. 1993)).

[71] *See* Aegis Op. Br. at 5-7.

clause; (ii) application of Delaware's Long-Arm Statute; and (iii) the conspiracy theory of jurisdiction.[72]  The Court considers each theory in turn.

### 1. THE FORUM SELECTION CLAUSE

When a party agrees to a Delaware forum selection clause in a contract, it has expressly consented to jurisdiction.[73]  Such express consent satisfies both prongs of the personal jurisdiction test, meaning there is no need to conduct a separate due process analysis.[74]

Here, the Employment Agreement contains a Delaware forum selection clause.[75]  That would be sufficient to establish jurisdiction over the two signatories to the contract, Plaintiff and Zoomcar India.  But Plaintiff seeks to enforce it against a non-signatory, Aegis Capital.[76]  That requires a further showing.

---

[72] *See* Ans. Br. to Aegis Mot. at 9-14.  Plaintiff also alleges "upon information and belief" that Aegis Capital "was at least initially formed as a Delaware entity" (Compl. ¶ 11) and points out that an entity called "Aegis Capital Corporation" "shows up on a Delaware Secretary of State search as a Delaware entity, but with an 'unassigned agent'" (Ans. Br. to Aegis Mot. at 15).  But the Aegis Defendants have represented to the Court that the Delaware-registered "Aegis Capital Corporation" dissolved in 1991 and is a different entity from the New York corporation Plaintiff named as a defendant.  *See* Aegis Reply at 7-8, Ex. A.

[73] *BAM Int'l, LLC v. MSBA Grp. Inc.*, 2021 WL 5905878, at *6 (Del. Ch. Dec. 14, 2021) (citing *Neurvana Med., LLC v. Balt USA, LLC*, 2019 WL 4464268, at *3 (Del. Ch. Sept. 18, 2019)).

[74] *Id*. (citing *Neurvana*, 2019 WL 4464268, at *3).

[75] Employment Agreement § 18.

[76] *See* Ans. Br. to Aegis Mot. at 10-11.

A party seeking to enforce a forum selection clause against a non-signatory must establish: (1) the forum selection clause is valid; (2) the non-signatory is a third-party beneficiary or is "closely related to" the contract; and (3) the claim arises from the non-signatory's standing relating to the agreement.[77] This case turns on the second element.

Plaintiff does not plead or argue that Aegis Capital is a third-party beneficiary to the Employment Agreement. Accordingly, to bind Aegis Capital to the forum selection clause, Plaintiff must plead that Aegis Capital is "closely related" to the Employment Agreement. Under Delaware law, a non-signatory may be "closely related" to an agreement where (a) the non-signatory received a "direct benefit" from the agreement or (b) it was "foreseeable" that the non-signatory would be haled into court in Delaware.[78]

Plaintiff fails to plead that Aegis Capital received a "direct benefit" from the Employment Agreement. "[I]ndirect benefits" are "insufficient."[79] In *Neurvana*, for example, the Court of Chancery rejected a plaintiff's argument that a parent company stood to receive a direct benefit from an agreement in which its subsidiary

---

[77] *Neurvana*, 2019 WL 4464268, at *3 (citing *Cap. Grp. Cos., Inc. v. Armour*, 2004 WL 2521295, at *5 (Del. Ch. Oct. 29, 2004)).

[78] *BAM Int'l*, 2021 WL 5905878, at *12 (quoting *Neurvana*, 2019 WL 4464268, at *1, *4).

[79] *Neurvana*, 2019 WL 4464268, at *4 (citing *Cap. Grp.*, 2004 WL 2521295, at *7).

18

acquired a medical device from plaintiff.[80]  Because the subsidiary, not the parent, was acquiring the device, any profits from the device would only benefit the parent indirectly.[81]  Additional case law is in accord, holding that benefits are not direct when they must pass through one entity to accrue to an out-of-state defendant.[82]  Here, Plaintiff alleges that Defendants benefitted by receiving Plaintiff's services as CEO on the terms of the Employment Agreement.[83]  But the Employment Agreement only required Plaintiff to serve as CEO of the Zoomcar Defendants, not Aegis Capital.[84]  To the extent that Plaintiff's service enhanced the value of the Zoomcar Defendants, that would only benefit Aegis Capital indirectly as an investor.

---

[80] *Id.*

[81] *Id.*

[82] *See, e.g.*, *Chumash Cap. Invs., LLC v. Grand Mesa P'rs, LLC*, 2024 WL 1554184, at *8-9 (Del. Super. Apr. 10, 2024) (holding benefit of equity purchase agreement to seller's members was indirect, because consideration under agreement "was paid only to [s]eller" and thus "necessarily had to pass through [s]eller" to reach its members); *P'rs & Simons, Inc. v. Sandbox Acquisitions, LLC*, 2021 WL 3161651, at *6 (Del. Ch. July 26, 2021) (ORDER) (rejecting plaintiff's theory that defendant received direct benefit from equity purchase agreement even where defendant was signatory company's "sole manager and board member" and plaintiff advanced a "theory that [defendant] controlled [the signatory company]," because payments to defendant would be received as equity holder of company).

[83] *See, e.g.*, Compl. ¶ 65 (alleging that, through the Employment Agreement, "Defendants intended to induce Plaintiff to continue investing his time while continuing to compromise his rights and/or forbear the making of a more specific demand"), ¶ 160 (alleging "Defendants derived expressly-stated (in the Employment Agreement) benefit . . . by Plaintiff agreeing to serve Zoom[car] Holdings as CEO 'without any additional compensation,' as stated in the Employment Agreement").

[84] *See* Employment Agreement § 1.

Plaintiff points to no other provision of the Employment Agreement that plausibly provides Aegis Capital with a direct benefit.[85]  Accordingly, Plaintiff fails to plead that the Employment Agreement's forum selection clause applies to Aegis Capital under the "direct benefit" test.

The Employment Agreement's forum selection clause thus will only apply to Aegis Capital if Plaintiff pleads that it was "foreseeable" that Aegis Capital would be haled into court here.  Delaware courts have cautioned that the foreseeability prong should be applied "narrowly," as an independent basis for jurisdiction only in two specific scenarios.[86]  Those scenarios are, first, "where a non-signatory defendant seeks to enforce a forum selection provision against a signatory plaintiff," and, second, "where a non-signatory is controlled by a signatory and the non-signatory bears a clear and significant connection to the subject matter of the agreement."[87]

---

[85] Plaintiff alleges that the Employment Agreement "includ[es] terms benefitting . . . the Aegis Defendants" (Compl. ¶ 65), but that allegation is conclusory, and Plaintiff does not point to any term that mentions the Aegis Defendants, let alone provides a direct benefit to them.  *See Ramunno*, 705 A.2d at 1034 ("[W]e ignore conclusory allegations that lack specific supporting factual allegations." (citation omitted)).

[86] *See Chumash*, 2024 WL 1554184, at *10 (quoting *Sustainability P'rs LLC v. Jacobs*, 2020 WL 3119034, at *7 (Del. Ch. June 11, 2020)); *Neurvana*, 2019 WL 4464268, at *6-8 (explaining that applying the foreseeability test too broadly runs the risk of "rejecting principles of corporate separateness," and providing detailed overview of foreseeability precedent).

[87] *Chumash*, 2024 WL 1554184, at *10 (internal quotation marks omitted) (quoting *Sustainability P'rs*, 2020 WL 3119034, at *7).

Neither of those narrowly defined scenarios applies here; rather, the Complaint in this case pleads the converse of each scenario. First, Plaintiff is a signatory seeking to enforce the forum selection provision against a non-signatory defendant, not a non-signatory defendant seeking to enforce it against a signatory plaintiff. Second, Plaintiff pleads that a signatory, Zoomcar India, is controlled by non-signatories, the Aegis Defendants. Delaware courts have expressly declined to exercise jurisdiction in similar circumstances.[88] Because "the facts at bar have not aligned with previous discrete applications of the standalone foreseeability inquiry, this Court . . . decline[s] to expand the test" here.[89] In sum, Plaintiff has not pleaded facts sufficient to extend application of the Employment Agreement's forum selection clause to Aegis Capital.

---

[88] *See, e.g.*, *Neurvana*, 2019 WL 4464268, at *6 ("Balt USA [the signatory] does not control Balt International [the non-signatory] . . . . In fact, Plaintiff alleges the opposite—that Balt International controlled Balt USA . . . .").

[89] *P'rs & Simons*, 2021 WL 3161651, at *7. Plaintiff cites two cases which, on first blush, may appear to expand the test to apply forum selection clauses to non-signatory controllers. *See* Ans. Br. to Aegis Mot. at 11 (citing case law to argue the proposition that "the Aegis Defendants are bound by the forum selection clause for a [Delaware-registered] company they control and have thereby implicitly consented to personal jurisdiction in Delaware"). But those cases concerned charter or bylaw forum selection provisions for breach of fiduciary duty claims, which involve the internal affairs of Delaware corporations. *Scianella v. AstraZeneca UK Ltd.*, 2024 WL 3327765, at *6, *15 (Del. Ch. July 8, 2024) (charter provision); *In re Pilgrim's Pride Corp. Derivative Litig.*, 2019 WL 1224556, at *12-13 (Del. Ch. Mar. 15, 2019) (bylaw). They are inapposite where, as here, the forum selection clause is contained in an employment contract or another type of external commercial agreement.

21

### 2.    THE LONG-ARM STATUTE

Plaintiff looks next to Delaware's Long-Arm Statute. In particular, Plaintiff invokes Section 3104(c)(3), which provides jurisdiction over any person who "[c]auses tortious injury in [Delaware] by an act or omission in [Delaware]."[90] According to Plaintiff, this prong applies because the Aegis Defendants are alleged to be "controllers of a Delaware entity" who "caused the removal of the CEO of that Delaware entity . . . and the deprivation of that CEO's equity interest in that same Delaware entity."[91]

These allegations do not suffice to confer jurisdiction under the Long-Arm Statute because none of them identify an "act or omission" in this State or that there was any tortious injury here.[92] There are no allegations that Aegis Capital, or any of its principals, were "ever physically present in Delaware or transacted any business here," let alone that they caused Plaintiff's removal or deprived him of his equity interest while here.[93] Nor are there allegations that Plaintiff ever worked or stepped

---

[90] Ans. Br. to Aegis Mot. at 12 (quoting 10 *Del. C.* § 3104(c)(3)).

[91] *Id.*

[92] *See Ramada Inns, Inc. v. Drinkhall*, 1984 WL 247023, at *2 (Del. Super. May 17, 1984) ("Delaware law requires both a tortious act within the State and an act or omission within the State.").

[93] *See Cargill, Inc. v. Rossi*, 2023 WL 6812881, at *5 (Del. Super. Oct. 16, 2023) (citations omitted); *see also Ciabattoni v. Teamsters Local 326*, 2016 WL 4442277, at *5 (Del. Super. Aug. 22, 2016) (declining to exercise personal jurisdiction where "Plaintiff does not allege that Defendant . . . was ever physically present in Delaware,

foot in Delaware, such that it could potentially be said that Defendants caused him injury here. Plaintiff's theory appears to be that causing a Delaware chartered corporation to take any act related to an executive's employment or equity interests—regardless of where those acts were taken—is enough to exercise jurisdiction over an out-of-state defendant. That is not Delaware law.[94]

Because Plaintiff does not identify any act or injury in Delaware, the Long-Arm Statute does not provide a basis for jurisdiction over Aegis Capital.[95]

---

let alone that the Facebook posts [that allegedly caused harm] were posted while Defendant Taylor was in Delaware").

[94] *See, e.g.*, *Cargill*, 2023 WL 6812881, at *5-6 (holding employee whose equity compensation in Delaware corporation was at issue, and who signed agreements containing forum selection clauses consenting to jurisdiction in Court of Chancery, was not subject to Superior Court jurisdiction because he lived and worked outside of Delaware); *Golden ShootProof Hldgs., LP*, 2023 WL 2255953, at *8 (Del. Ch. Feb. 28, 2023) (rejecting as insufficient to confer personal jurisdiction contention that defendants were "officers or directors of Delaware entities" that "directed the corporation to take [an] act" to "cause[] the merger of two Delaware corporations"); *SDF Funding LLC v. Fry*, 2022 WL 1521309, at *2 (Del. Ch. May 13, 2022) (holding defendants' "exercise of the disputed stock options" of Delaware corporation was not an "act or omission" in Delaware, and observing that Section 3104(c)(3) cannot "permit the exercise of jurisdiction whenever a nonresident causes economic harm to a Delaware corporation").

[95] Even if the Long-Arm Statute applied, Plaintiff would still be required to demonstrate that exercising jurisdiction over Aegis Capital comports with due process. Plaintiff's briefing contains no argument on the due process requirement. *See* Ans. Br. to Aegis Mot. at 9-10, 12 (noting separate due process prong and that the Long-Arm Statute is "broadly construed to confer jurisdiction to the maximum extent possible under the Due Process Clause," but lacking argument that due process would be satisfied here (citation omitted)).

23

### 3. THE CONSPIRACY THEORY

As a final alternative basis for jurisdiction over Aegis Capital, Plaintiff invokes the "conspiracy theory of personal jurisdiction."[96] The conspiracy theory is a "strict test" that requires Plaintiff to "make a factual showing that: (1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in Delaware; (4) the defendant knew or had reason to know of the act in Delaware or that acts outside the forum state would have an effect in Delaware; and (5) the act in, or effect on, Delaware was a direct and foreseeable result of the conduct in furtherance of the conspiracy."[97]

Importantly, "[a] conspiracy is not an independent jurisdictional hook: there must still be an anchoring Delaware act."[98] As explained above regarding the Long-Arm Statute, the Complaint fails to plead any anchoring act or effect that occurred in Delaware. Plaintiff's conspiracy theory argument repeats the same acts that the Court found insufficient under the Long-Arm Statute, i.e., that Defendants acted in

---

[96] *See id.* at 12-14.

[97] *Instituto Bancario Italiano SpA v. Hunter Eng'g Co., Inc.*, 449 A.2d 210, 225 (Del. 1982).

[98] *Altabef v. Neugarten*, 2021 WL 5919459, at *8 (Del. Ch. Dec. 15, 2021) (citing *Instituto Bancario*, 449 A.2d at 225; *LeCroy Corp. v. Hallberg*, 2009 WL 3233149, at *6 (Del. Ch. Oct. 7, 2009); *Hercules Inc. v. Leu Tr. & Banking (Bahamas) Ltd.*, 611 A.2d 476, 482 n.6 (Del. 1992)).

ways that affected his equity interest in and employment by a Delaware entity. Hence, the conspiracy theory does not extend this State's jurisdictional reach to Aegis Capital.

*    *    *

The Complaint fails to plead a basis for this Court to exercise personal jurisdiction over Aegis Capital. Accordingly, the claims against Aegis Capital are dismissed without prejudice under Rule 12(b)(2).

## B. THE COMPLAINT PLEADS FACTS SUFFICIENT TO PUT STERNAEGIS ON NOTICE OF THE CLAIMS ASSERTED AGAINST IT.

Before diving into the specific claims, the Aegis Defendants advance a threshold argument: They contend that all claims against Sternaegis should be dismissed because the Complaint "lumps" it together with other Defendants, rather than making specific "well-pled facts to suggest any wrongdoing by" Sternaegis individually.[99] Plaintiff counters that allegations against two entities together are sufficient to state a claim where the complaint pleads that both entities participated in the alleged conduct.[100]

Delaware is a notice pleading jurisdiction.[101] That means that, unless some heightened pleading requirement applies, a complaint will survive a motion to

---

[99] *See* Aegis Op. Br. at 7.

[100] Ans. Br. to Aegis Mot. at 16-17.

[101] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 611 (Del. 2003).

dismiss if it "give[s] the defendant fair notice" of the claim under which the pleader would be entitled to relief.[102]  Consistent with this liberal notice pleading standard, "Delaware law does not prohibit group pleading," though the practice is "disfavored."[103]  Delaware courts have dismissed claims against an individual defendant where the complaint "lump[s]" that defendant "together with other defendants such that there are no well-pled facts to suggest any wrongdoing by that defendant."[104]  Taken together, it is appropriate for the Court to dismiss claims against a defendant where the complaint's group pleading, or "lumping," prevents that defendant from receiving fair notice of the wrongdoing in which it is alleged to have engaged.  If, on the other hand, the plaintiff pleads facts that would place the defendant on notice of its alleged wrongdoing, but groups it with another defendant because "*both* entities participated in all the pertinent conduct alleged," then the claims will survive a pleading-stage motion.[105]

Here, the Complaint provides sufficient notice of the claims against Sternaegis.  Although Plaintiff groups Sternaegis with Aegis Capital as the "Aegis

[102] *Id*.

[103] *Principal Growth Strategies, LLC v. AGH Parent LLC*, 2024 WL 274246, at *20 (Del. Ch. Jan. 25, 2024) (citations omitted).

[104] *NuVasive, Inc. v. Miles*, 2020 WL 5106554, at *8 (Del. Ch. Aug. 31, 2020) (citing *Howland v. Kumar*, 2019 WL 2479738, at *5 (Del. Ch. June 13, 2019)).

[105] *See id.*

Defendants," he does so because he pleads that they both participated in the alleged wrongdoing. The Complaint alleges the Aegis Defendants together exercised control over the Zoomcar Defendants for their own benefit and the Zoomcar Defendants' detriment, culminating in allegedly manufacturing "Cause" to terminate Plaintiff without paying him benefits.[106] Moreover, Plaintiff pleads that the Aegis Defendants acted through certain individuals,[107] and it can be difficult to determine at the motion to dismiss stage whether an individual is acting on behalf of one entity or another with which she is associated.[108] Whether the Complaint's allegations are sufficient to state reasonably conceivable claims is addressed below, and whether they are supported by evidence will be assessed once a record has been created.

Accordingly, the Court will not dismiss all counts against Sternaegis for group pleading. Rather, it will assess the individual counts brought against Sternaegis along with those brought against the other Defendants.

---

[106] *See, e.g.*, Compl. ¶¶ 3, 33-35, 38, 42, 44-47, 53-54, 66, 77, 85, 94.

[107] *See id.* ¶ 33.

[108] *See In re WeWork Litig.*, 2020 WL 7343021, at *11 (Del. Ch. Dec. 14, 2020) (explaining that it can "be difficult to discern" whether individuals are wearing the "hat" of one entity or that of a closely related entity and that "[o]n a motion to dismiss, the court cannot make such capacity determinations").

### C. COUNT II FAILS TO ALLEGE A BREACH OF NEW YORK LABOR LAW BECAUSE NEW YORK LAW DOES NOT APPLY.

Turning to the individual claims, in Count II, Plaintiff alleges that by failing to make the $100,000 Payment and 8% Equity Grant, Defendants violated New York labor law.[109] Defendants argue that Count II should be dismissed because the Employment Agreement provides that the law of Delaware, not New York, applies.[110]

In a choice of law analysis, Delaware courts address "three threshold elements," namely: (i) "determining if the parties made an effective choice of law through a contract;" (ii) "if not, determining if there is an actual conflict between the laws of the different states each party urges should apply;" and (iii) "if so, analyzing which state has the most significant relationship" to the disputed issue.[111] The Court therefore begins with the contract before considering other factors.

The Employment Agreement provides that "[t]his Agreement and any controversy arising out of or relating to this Agreement shall be governed by the internal law of the State of Delaware, without giving effect to principles of conflicts

---

[109] *See* Compl. ¶¶ 148-56.

[110] *See* Zoomcar Op. Br. at 20-21; Aegis Op. Br. at 8.

[111] *Travelers Indem. Co. v. CNH Indus. Am., LLC*, 191 A.3d 288, 2018 WL 3434562, at *3 (Del. 2018) (TABLE) (quoting *Certain Underwriters at Lloyds, London v. Chemtura Corp.*, 160 A.3d 457, 464 (Del. 2017)).

of law."[112] Plaintiff does not dispute that this choice-of-law provision is valid, nor does he dispute that its plain terms encompass the present controversy.[113] Accordingly, the Court must determine whether some exception applies to permit Plaintiff's New York labor law claims despite the choice-of-law provision.

"Delaware courts are 'strongly inclined to respect [parties'] agreement'" and, accordingly, "regularly express their reluctance to allow avoidance of [a] contractual choice-of-law provision."[114] Thus, the party seeking to avoid such a provision bears the "burden to demonstrate that [it] should not apply."[115] To bear its burden, the party must show that its case fits into one of two exceptions under Section 187 of the Restatement (Second) Conflicts of Law (the "Restatement").[116] Those exceptions apply if:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

---

[112] Employment Agreement § 17.

[113] *See* Pl. Suppl. Br. at 1-4 (explaining that Plaintiff does not argue that the choice-of-law provision is "limited or void," and acknowledging the provision's "applicability").

[114] *Change Cap. P'rs Fund I, LLC v. Volt Elec. Sys., LLC*, 2018 WL 1635006, at *9 (Del. Ch. Apr. 3, 2018) (first alteration in original) (quoting *Libeau v. Fox*, 880 A.2d 1049, 1056-57 (Del. Ch. 2005)).

[115] *See Sycamore P'rs Mgmt., L.P. v. Endurance Am. Ins. Co.*, 2021 WL 761639, at *1 (Del. Super. Feb. 26, 2021).

[116] *See Troy Ventures, LLC v. Kosloski*, 2025 WL 1172758, at *10 (Del. Super. Apr. 21, 2025).

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice-of-law provision.[117]

The first exception does not apply. Delaware statute directs the Court to "conclusively presume[]" that this State has a "significant, material and reasonable relationship" to the contract.[118] This Court will follow the General Assembly's direction.[119]

Nor does the second exception apply. Under Restatement Section 187(2)(b), Plaintiff must show: (1) applying Restatement Section 188, New York would be the "default" state but for the choice-of-law provision; (2) enforcement of the

---

[117] *Focus Fin. P'rs, LLC v. Holsopple*, 241 A.3d 784, 803 (Del. Ch. 2020) (quoting Restatement (Second) of Conflict of Laws § 187(2) (Am. Law Inst. 1971) (hereinafter "Restatement")).

[118] 6 *Del. C.* § 2708(a).

[119] Moreover, the Employment Agreement notes that a party to the contract, Zoomcar India, is and will be the subsidiary of a Delaware entity, Zoomcar, Inc., and provides for circumstances in which Moran could receive equity in that Delaware entity. *See* Employment Agreement, Whereas Clause ¶¶ B-C, Annex. A ¶ 3. Although this does not fall within one of the specific examples in the comments to Restatement § 187, those comments make clear that the "reasonable basis" requirement is broad, noting that "rarely, if ever, will the parties choose a law without good reason for doing so." *See* Restatement § 187 cmt. f (explaining that, even where a state "has no substantial relationship" with the contract, the parties may still "have a reasonable basis" for choosing that state). Even absent 6 *Del. C.* § 2708(a), the contract's connection to Delaware through Zoomcar India's parent and a potential award of a Delaware corporation's equity provides a reasonable basis to choose Delaware under the Restatement's broad test.

Employment Agreement would be contrary to a fundamental public policy of New York; and (3) New York has a materially greater interest than Delaware in the enforcement or non-enforcement of the agreement.[120]  Here, the first prong is dispositive.[121]

To determine the default state, Restatement Section 187(2)(b) directs courts to consider the factors in Section 188.  Those factors are:

> (a)  the place of contracting,
>
> (b)  the place of negotiation of the contract,
>
> (c)  the place of performance,
>
> (d)  the location of the subject matter of the contract, and
>
> (e)  the domicil, residence, nationality, place of incorporation and place of business of the parties.[122]

---

[120] *See Sycamore P'rs*, 2021 WL 761639, at *7; Restatement § 187(2)(b).

[121] Plaintiff contends that the Restatement test does not apply because he is not arguing that the choice-of-law provision is "limited or void."  *See* Pl. Supp. Br. at 3 (quoting *Ascension Ins. Hldgs., LLC v. Underwood*, 2015 WL 356002, at *2 (Del. Ch. Jan. 28, 2015)).  Yet Plaintiff does seek to limit the choice-of-law provision: he asks the Court to carve out New York labor law claims from its broad scope.  Citing one case from a federal district court, Plaintiff appears to contend that there is a freestanding "public policy" exception for labor law claims.  *See id.* at 1-3 (citing *Pestell v. CytoDyn, Inc.*, 2020 WL 3128270, at *2 (D. Del. June 12, 2020)).  Delaware state courts have not recognized such an exception; rather, they consider public policy within the framework of the Restatement.  *See, e.g., Sycamore P'rs*, 2021 WL 761639, at *7 (applying Restatement Section 187(2)(b), including considering whether enforcement of agreement "would be contrary to a fundamental public policy" of the default state); *Ascension*, 2015 WL 356002, at *2 (same).

[122] Restatement § 188(2); *see also Focus Fin. P'rs*, 241 A.3d at 805.  Section 188 also directs the court to consider the "principles stated in § 6," which are: (a) the

In weighing these factors, the Court takes heed that "a particularly significant factor for contract cases is upholding the justified expectations of the parties."[123] As the comments to the Restatement make clear: "Protecting this interest promotes 'the values of certainty, predictability and uniformity of result.'"[124]

Applying these factors here, the parties do not identify the place of contracting or where the contract was negotiated, meaning that (a) and (b) bear no weight. Turning to (c) and (d), the Employment Agreement provides that Plaintiff will work at a specific location in India.[125] The Employment Agreement contemplates that Plaintiff's place of employment may move, but if so only to "Bangalore or elsewhere in India," and it notes that Plaintiff's "duties may include travel to various parts of India."[126] Plaintiff alleges that, despite this provision, he "spent the majority of this

---

needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f) certainty, predictability and uniformity of result; and (g) ease in the determination and application of the law to be applied. Restatement §§ 6(2), 188.

[123] *Focus Fin. P'rs*, 241 A.3d at 805 (citing Restatement § 188 cmt. a).

[124] *Id.* (quoting Restatement § 188 cmt. a).

[125] Employment Agreement § 3.

[126] *Id.*

time living in and working from New York."[127]  Turning last to (e), Zoomcar India

is domiciled and operates in India, and Plaintiff alleges he resides in New York.[128]

Plaintiff has not shown that New York would be the default state under these

factors.  At the time of contracting, the parties could not have reasonably expected

that New York labor law would apply.  The Employment Agreement provides that

Plaintiff's principal place of employment would be in India, as he worked for an

Indian company.  It does not mention New York, nor is there any allegation that

Zoomcar India operates in New York.  To permit Plaintiff to apply New York law

because—contrary to the contract—he later worked mostly in New York, would

undermine the "justified expectations of the parties."[129]

Plaintiff seeks to avoid this result by contending, first, that Zoomcar India

should not be permitted to "enjoy the many benefits of conducting substantial

business" in New York without being subject to its labor laws.[130]  But Plaintiff does

---

[127] Compl. ¶ 76.

[128] *Id.* ¶ 15 (indicating that Zoomcar Holdings was the parent entity of "Zoomcar India" and other Zoomcar entities "across other operating jurisdictions"), ¶ 28 (noting that "Zoomcar's business" was harmed when "India faced significant economic turbulence" that disrupted "transportation and . . . mobility"), ¶ 37 (alleging board members were unfit because they "had never even visited India and had no prior experience with operating companies in India").

[129] *See* Restatement § 188 cmt. a.

[130] *See* Ans. Br. to Aegis Mot. at 18 (quoting *Pierre v. GTS Holdings, Inc.*, 2015 WL 7736552, at *4 (Nov. 30, 2015 S.D.N.Y.)); *see also* Pl. Supp. Br. at 5-6.

33

not allege that Zoomcar India "conduct[s] substantial business" in New York. Nor does he allege that anyone directed him to work there.[131] Second, Plaintiff contends that if New York's labor laws do not apply, he will be "left without a statutory remedy."[132] Yet, Plaintiff alleges he is entitled to benefits under Indian law beyond those set forth in the Employment Agreement.[133] This only underscores that the law of India, not New York, is likely the default, and there is no unfairness in declining to apply New York labor law when Plaintiff agreed to the law of another state and seeks to invoke Indian law as well.

The Employment Agreement contains a broad Delaware choice-of-law provision. Plaintiff has not met his burden to show that there is an exception to that provision for his New York labor law claims. Accordingly, Plaintiff's claim for breach of New York labor law is dismissed.[134]

---

[131] Plaintiff alleges that he lived and worked in New York "due to legal dispute requirements created by the Aegis Defendants (as set forth in greater detail below) and other capital market fundraising needs of Zoomcar." Compl. ¶ 76. Absent is an allegation that anyone directed Plaintiff to work in New York and, despite promising "greater detail below," Plaintiff does not allege what "requirements" caused him to work in New York.

[132] *See* Pl. Supp. Br. at 2 (quoting *Pestell*, 2020 WL 3128270, at *2).

[133] Compl. ¶¶ 120, 133-35 (alleging he is entitled to a "gratuity" under "India's Payment of Gratuity Act" and "leave encashment" under "the Karnataka Shops and Commercial Establishments Act, 1961").

[134] Because New York labor law does not apply, the Court need not reach Defendants' arguments for dismissal under that law, namely, that the 8% Equity Grant is not a

**D. COUNT IV STATES A CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACT BUT NOT FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS.**

In Count IV, Plaintiff brings a claim he styles as "tortious interference with Employment Agreement and business relations."[135] Although "closely related,"[136] tortious interference with contract and tortious interference with prospective business relations are "two separate torts."[137] Accordingly, the Court analyzes each tort separately, first interference with contract, and then interference with prospective business relations.

### 1. TORTIOUS INTERFERENCE WITH CONTRACT

A claim for tortious interference with contract has five elements: "(1) a contract, (2) about which defendant knew, and (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5)

---

"wage" and the Aegis Defendants are not Plaintiff's "employer." *See* Zoomcar Op. Br. at 21-23; Aegis Op. Br. at 8-9.

[135] *See* Compl. at 49.

[136] *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at \*22 (Del. Ch. Oct. 23, 2002) (citing *DeBonaventura v. Nationwide Mut. Ins. Co.*, 419 A.2d 942, 947 (Del. Ch. 1980)).

[137] *Two Farms, Inc. v. Davis, Bowen & Friedel, Inc.*, 2018 WL 6721379, at \*4 n.18 (Del. Ch. Dec. 19, 2018); *see also* Restatement (Second) of Torts § 766 cmts. a, c (Am. Law Inst. 1975) (outlining history through which tortious interference with contract developed "as a separate tort" and noting that rule for "intentional interference with prospective contractual relations not yet reduced to contract is stated in [a separate section]").

which causes injury."[138]   Defendants do not challenge elements (1), (2), or (5). Instead, they raise myriad arguments concerning the "justification" and "intentional act" elements.  The Court addresses these arguments in turn.

### a.    THE AFFILIATE PRIVILEGE

Zoomcar Holdings argues that it is protected by the "affiliate privilege,"[139] a doctrine that this Court recently addressed.[140]  In short, the affiliate privilege "shields an affiliate from primary or vicarious tort liability for the breach of a contract to which the affiliate itself was not a signatory."[141]  "Courts assess the affiliate privilege under the 'justification' element because the doctrine balances value judgments about when a corporate parent is 'justified' in interfering with its subsidiary."[142]

At the pleading stage, a plaintiff may overcome the privilege by alleging that the affiliate acted in bad faith.[143]  In this context, courts have found bad faith "where

---

[138] *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013) (emphasis omitted) (quoting *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 992 (Del. Ch. 1987)).

[139] *See* Zoomcar Op. Br. at 29-33.

[140] *See Koscho v. Merit Distrib. Grp., LLC*, 2025 WL 2770543, at *8 (Del. Super. Sept. 29, 2025).

[141] *Id.* (quoting *Buck v. Viking Hldg. Mgmt. Co. LLC*, 2021 WL 673459, at *6 (Del. Super. Feb. 22, 2021)).

[142] *Id.* (citing *Buck*, 2021 WL 673459, at *6; *Surf's Up Legacy P'rs, LLC v. Virgin Fest*, 2021 WL 117036, at *7 (Del. Super. Jan. 13, 2021); *Shearin v. E.F. Hutton Grp., Inc.*, 652 A.2d 578, 591 (Del. Ch. 1994)).

[143] *Id.* (citing *Bandera Master Fund LP v. Boardwalk Pipeline P'rs, LP*, 2019 WL 4927053, at *27 (Del. Ch. Oct. 7, 2019)).

the controller took action that harmed the subsidiary in some way, such as by rendering it insolvent or decreasing its value."[144] That makes sense, because such action would undermine the presumption underlying the privilege: that a corporate affiliate would act to "pursu[e] . . . the legitimate profit seeking activities of the affiliated enterprises."[145]

Here, Plaintiff has alleged facts sufficient to infer bad faith. Plaintiff alleges that after the Aegis Defendants took control of Zoomcar Holdings, which in turn controlled Zoomcar India, they took actions that harmed the Zoomcar business. Plaintiff alleges, for example, that Zoomcar Holdings, at the behest of the Aegis Defendants, engaged in corporate restructuring and pushed toward a SPAC that Zoomcar's business was not ready for.[146] Plaintiff further alleges that this decision to pursue a SPAC led Zoomcar to raise more capital from the Aegis Defendants, granting them further control and benefitting them to the detriment of the Zoomcar business.[147] Ultimately, Plaintiff alleges, Plaintiff's criticisms of these and other

---

[144] *Id.* (citing *Surf's Up*, 2021 WL 117036, at *9; *Boardwalk*, 2019 WL 4927053, at *27; *AM Gen. Hldgs. LLC v. Renco Grp., Inc.*, 2013 WL 5863010, at *13 (Del. Ch. Oct. 31, 2013)).

[145] *See Skye Minerals Inv'rs, LLC v. DXS Cap. (U.S.) Ltd.*, 2020 WL 881544, at *33 (Del. Ch. Feb. 24, 2020) (quoting *AM Gen. Hldgs*, 2013 WL 5863010, at *12).

[146] *See* Compl. ¶¶ 38, 42.

[147] *See id.* ¶¶ 53-54.

decisions culminated in his termination.[148]   Plaintiff alleges that Defendants "disingenuously concocted" "Cause" for his termination to deprive him of benefits of the Employment Agreement.[149]  Based on the allegations of actions taken to the detriment of Zoomcar's business, the Court can infer that his termination was in bad faith rather than as part of Zoomcar's legitimate profit seeking activities.  At this stage, that inference need not be strong, just reasonable, and the Court finds that Plaintiff has met that minimal pleading-stage burden.[150]

It is true that Plaintiff's Complaint could be clearer in alleging which persons and entities were acting at which times.  It is also likely that Zoomcar Holdings and the Aegis Defendants may contend that their actions were aimed at benefitting the Zoomcar business, or that Zoomcar Holdings acted independently of the Aegis Defendants.  But "the overall narrative alleged in the Complaint" is that the Aegis Defendants, and Zoomcar Holdings acting at their behest, took actions for their own benefit and to the detriment of the Zoomcar business, culminating in their pushing

---

[148] *See id.* ¶¶ 40, 51, 96-97.

[149] *See id.* ¶¶ 115, 172.

[150] *See Beyond Risk Topco Hldgs., L.P. v. Chandler*, 2024 WL 4369239, at \*24 (Del. Super. Sept. 24, 2024) (holding that "the allegations of bad faith here are enough to support a reasonable inference drawn in [counterclaim plaintiff's] favor that [counterclaim defendant] was not pursuing legitimate business interests when [counterclaim plaintiff] was terminated").

to terminate Plaintiff.[151]  That is the narrative that the Court must accept at this early stage, and Defendants will have ample opportunity to challenge it later in the case.

### b. THIRD-PARTY BENEFICIARIES

Zoomcar Holdings next seeks to dismiss the tortious interference claim on grounds that it is "a third-party beneficiary" to the Employment Agreement.[152] Zoomcar Holdings invokes the "stranger rule"[153] in arguing that it cannot be liable for tortious interference because it is not "a stranger to both the contract and the business relationship giving rise to and underpinning the contract."[154]

The Court of Chancery has persuasively rejected the stranger rule as "contrary to . . . Delaware Supreme Court" precedent.[155]  In *Bandera*, the court explained that the rule was derived from Georgia case law, which applies an absolute affiliate privilege under which an entity can never be liable for tortiously interfering with its affiliates' contracts.[156]  By contrast, as outlined above, Delaware applies a limited

---

[151] *See WeWork*, 2020 WL 7343021, at *11.

[152] *See* Zoomcar Op. Br. at 23-26; Zoomcar Reply at 8-9.

[153] *See Bandera*, 2019 WL 4927053, at *27.

[154] *See* Zoomcar Reply at 8 (quoting *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at *27 (Del. Ch. Nov. 17, 2014)).

[155] *Bandera*, 2019 WL 4927053, at *28; *see also, e.g.*, *Sorrento Therapeutics, Inc. v. Mack*, 2023 WL 5670689, at *22 (Del. Ch. Sept. 1, 2023) (following *Bandera* in rejecting the stranger rule).

[156] *See Bandera*, 2019 WL 4927053, at *27.

affiliate privilege under which an affiliate can be liable for tortious interference if it acts in bad faith.[157]

Here, Zoomcar Holdings seeks to apply the stranger rule to itself as a third-party beneficiary, rather than as an affiliate. Nonetheless, *Bandera*'s rejection of the stranger rule and Delaware's approach to the affiliate privilege are instructive in considering how this State's courts would approach a third-party beneficiary privilege.[158] Moreover, as with the affiliate privilege, there is Georgia case law applying the stranger rule to hold that a third-party beneficiary can never be liable for tortious interference.[159] And just as with the affiliate privilege, there are reasons to take a more nuanced approach to a potential privilege for third-party beneficiaries. Third-party beneficiaries, like affiliates, may have justifiable reasons to interfere with a contract. Whereas affiliates may justifiably interfere when they "pursuing in good faith the legitimate profit seeking activities of the affiliated enterprises,"[160]

---

[157] *See id.* at *27-28.

[158] No party cites a Delaware case concerning whether a third-party beneficiary can be liable for tortious interference with contract, and the Court is aware of none.

[159] *See* Dan B. Dobbs, Paul T. Hayden & Ellen M. Bublick, *The Law of Torts* § 636 (2d ed. Westlaw Apr. 2025 Update) (explaining that Georgia's "broad form of protection" under the stranger rule "has been applied to protect . . . third party beneficiaries of the contract" (citing *Cohen v. William Goldberg & Co., Inc.*, 413 S.E.2d 759, 765 (Ga. Ct. App. 1991), *rev'd in part on other grounds*, 423 S.E.2d 231 (Ga. 1992))).

[160] *See Shearin*, 652 A.2d at 591.

third-party beneficiaries may justifiably interfere when they are in good faith seeking the benefits to which they are entitled under the agreement. Yet third-party beneficiaries, also like affiliates, are not themselves party to the contract.[161]

Based on these considerations, the Court determines that the bright-line stranger rule does not apply to bar tortious interference claims against third-party beneficiaries. Rather, to the extent there is a third-party beneficiary privilege in this State, it is a limited one. Third-party beneficiaries can be presumed to act in good faith to seek the benefits to which they are entitled under the contract, but that presumption may be overcome by a showing of bad faith.

Applying the same test as the affiliate privilege, the Court reaches the same result. As explained above, the Complaint pleads bad faith. Accordingly, Zoomcar Holdings' status as a third-party beneficiary to the Employment Agreement does not insulate it from Plaintiff's tortious interference claim.[162]

---

[161] Indeed, a third-party beneficiary is, by definition, a third party, meaning it is "not a party to [the] . . . agreement." *Third Party*, Black's Law Dictionary (12th ed. 2024).

[162] In a similar vein, Zoomcar Holdings argues that it cannot be liable for tortious interference because "Plaintiff seeks to hold it liable for the alleged breach of the Employment Agreement under Count II." *See* Zoomcar Op. Br. at 23-24. Even assuming Zoomcar Holdings' characterization of Count II is correct, the Court declines to dismiss the tortious interference claim on this ground as well. Because Count II has been dismissed, there is no risk that Zoomcar Holdings will be held liable both for breach under that count and for tortious interference under Count IV.

### c. JUSTIFICATION, APART FROM THE AFFILIATE PRIVILEGE

Although the affiliate privilege arises under the justification prong, both Zoomcar Holdings and the Aegis Defendants contend the Complaint fails to allege lack of justification more generally.[163]

The justification element "requires the court to engage in a fact-specific inquiry to determine whether the interference with contract is improper under the particular circumstances of the case."[164] That task is "ill-suited for the pleading stage."[165]

The Court holds that Plaintiff's allegations are sufficient to plead lack of justification.[166] In addition to the actions set forth in the affiliate privilege section above, which suffice as to Zoomcar Holdings, the Complaint alleges that the Aegis Defendants filed a lawsuit against Zoomcar and conditioned any further funding on

---

[163] *See* Zoomcar Op. Br. at 30-33; Aegis Op. Br. at 14-15.

[164] *Jhaveri v. K1 Inv. Mgmt. LLC*, 2025 WL 1779507, at *16 (Del. Ch. June 27, 2025) (quoting *Bandera*, 2019 WL 4927053, at *26). The factors Delaware courts consider in this inquiry are: "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties." *Bandera*, 2019 WL 4927053, at *26 (quoting *WaveDivision Hldgs., LLC v. Highland Cap. Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012)).

[165] *Jhaveri*, 2025 WL 1779507, at *16.

[166] *See id.* (holding plaintiff's "allegations of 'fraudulent, intentional, willful, and malicious' actions by the . . . Defendants are sufficient").

"Plaintiff's ouster from the company."[167] Plaintiff's allegations are adequate at the pleading stage.

### d. INTENTIONAL ACT

Last, Zoomcar Holdings and the Aegis Defendants argue that Plaintiff failed to plead that they engaged in an intentional act that caused the alleged breach of the Employment Agreement.[168] Because bad faith in the tortious interference context generally requires a showing of an action that harmed an affiliate in some way, it would be a rare case to find bad faith was pled but not an intentional act.[169]

As explained above, Plaintiff has alleged that the Aegis Defendants conditioned any further funding on terminating Plaintiff and demanded that he sign a document effecting his resignation.[170] The Complaint also alleges that the Aegis Defendants and Zoomcar Holdings "demanded that Plaintiff waive and release all pre-existing contractual rights or face ouster" and then, after terminating him, "participated in articulating a disingenuous and flawed narrative of 'cause'" to

---

[167] *See* Compl. ¶¶ 77, 86.

[168] *See* Zoomcar Op. Br. at 27-29; Aegis Op. Br. at 15-16.

[169] *Cf. NAMA Hldgs.*, 2014 WL 6436647, at *28 (explaining that "the intent requirement is met by 'an interference that is incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his action'" (quoting Restatement (Second) of Torts § 766 cmt. j)).

[170] *See* Compl. ¶¶ 86-87, 90, 94.

deprive Plaintiff of benefits under the Employment Agreement.[171]  Considering these actions and the narrative set forth further above, Plaintiff has met his minimal burden of pleading that the Aegis Defendants and Zoomcar Holdings took intentional acts to cause Zoomcar India to breach the Employment Agreement.[172]

Accordingly, Defendants' motions to dismiss Count IV's tortious interference with contract claim are denied.[173]

### 2. TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

In addition to tortious interference with contract, Count IV folds in a claim for tortious interference with prospective business relations.  As noted above, these are two separate claims.  One key difference is that whereas tortious interference with

---

[171] *See id.* ¶¶ 94, 172.

[172] *See Jhaveri*, 2025 WL 1779507, at *16 (holding intentional act pled where complaint alleged defendants took acts that were "a significant factor leading Goyle to breach his [Equityholders' Representative] duties" and "deprived plaintiff of payments he would otherwise have received"); *NAMA Hldgs.*, 2014 WL 6436647, at *28 (holding intentional act element "easily met" where "[t]hrough Brenner, Related Parent caused Related Sub to release the Disputed Amounts" in violation of contract).

[173] The Aegis Defendants also contend that the tortious interference claim against them should be dismissed because Plaintiff has not pled an underlying breach of the Employment Agreement.  *See* Aegis Op. Br. at 16.  But no party moved to dismiss Count I for breach of the Employment Agreement, and the Court will not declare that there has been no breach on such scant briefing on the topic.

contract requires "an existing contract," tortious interference with prospective business relations requires "the reasonable probability of a business opportunity."[174]

To plead the reasonable probability of a business opportunity, a plaintiff cannot rely on general conjecture, such as by offering "vague statements about unknown customers" or alleging "a 'nebulous unascertainable class' of business relationships."[175] Rather, a plaintiff "must identify a specific party who was prepared to enter into a business relationship but was dissuaded from doing so by the defendant."[176]

Plaintiff does not identify the reasonable probability of a business opportunity. The only opportunity he alleges is the opportunity to obtain benefits under the Employment Agreement, but that "opportunity" was already reduced to a fully integrated contract.[177] To the extent that Zoomcar Holdings and the Aegis Defendants interfered, they interfered with the Employment Agreement, not with

---

[174] *See DeBonaventura*, 419 A.2d at 947; *see also* Restatement (Second) of Torts §766B cmt. a (distinguishing between "intentional interference with . . . performance of [an] existing contract" and "intentional interference with prospective contractual relations, not yet reduced to contract").

[175] *Organovo Hldgs., Inc. v. Dimitrov*, 162 A.3d 102, 122-23 (Del. Ch. 2017) (first quoting *Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865, at *7 (Del. Ch. Jan. 20, 2009); and then quoting *Kimbleton v. White*, 2014 WL 4386760, at *8 (D. Del. Sept. 4, 2014)).

[176] *Id.* (quoting *Agilent Techs.*, 2009 WL 119865, at *7).

[177] *See* Employment Agreement § 13.

potential future business relations. Accordingly, Plaintiff's claim for tortious interference with prospective business relations is dismissed.

### E. COUNT V STATES A CLAIM FOR DECLARATORY JUDGMENT.

In Count V, Plaintiff seeks a declaratory judgment concerning his rights under the Employment Agreement.[178] The Aegis Defendants contend that Count V should be dismissed as to them because they are not parties to the Employment Agreement and "there is no live controversy concerning Plaintiff and the Aegis Defendants."[179]

"Delaware courts are statutorily authorized to entertain an action for a declaratory judgment, provided that an 'actual controversy' exists between the parties."[180] An "actual controversy" requires the following four prerequisites:

> (1) It must be a controversy involving the rights or other legal relations of the party seeking declaratory relief; (2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be between parties whose interests are real and adverse; (4) the issue involved in the controversy must be ripe for judicial determination.[181]

Each prerequisite is met here.

---

[178] *See* Compl. ¶¶ 176-82.

[179] Aegis Op. Br. at 17-18.

[180] *XL Specialty Ins. Co. v. WMI Liquidating Tr.*, 93 A.3d 1208, 1216-17 (Del. 2014) (first citing 10 *Del. C.* § 6501; and then quoting *Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 479 (Del. 1989)).

[181] *Id*. at 1217.

First, the controversy involves Plaintiff's rights under the Employment Agreement. Second and third, the Aegis Defendants have an interest in contesting Plaintiff's claims that is "real and adverse" to Plaintiff's interests. Count IV asserts that the Aegis Defendants tortiously interfered with the Employment Agreement. The Aegis Defendants thus have a real interest in contesting whether there has been an underlying breach of that contract, as they implicitly recognize by arguing that there has been no breach.[182] Fourth, the controversy is ripe for judicial determination. Plaintiff asserts that a breach of the Employment Agreement occurred when he was terminated, purportedly for "Cause," and when Zoomcar India failed to pay him benefits when due.[183] The issue of whether there has been a breach of Plaintiff's rights under the Employment Agreement is thus ripe.

The Aegis Defendants' motion to dismiss Count V is denied.

---

[182] *See* Aegis Op. Br. at 16 (arguing that "Plaintiff has failed to state a claim for tortious interference because there is no identification of a breach of his Employment Agreement").

[183] *See* Compl. ¶¶ 115-18, 143.

47

## V.  CONCLUSION

For the foregoing reasons, the Court rules on Defendants' motions to dismiss as follows:

- The Aegis Defendants' motion to dismiss all claims against Aegis Capital for lack of personal jurisdiction is **GRANTED, WITHOUT PREJUDICE**.

- Defendants' motions to dismiss Count II are **GRANTED**.

- Defendants' motions to dismiss Count IV are **DENIED** as to the tortious interference with contract claim but **GRANTED** as to the tortious interference with prospective business relations claim.

- The Aegis Defendants' motion to dismiss Count V is **DENIED**.

Taking account of this ruling and the Court's ruling from the bench on Count III, the following claims remain:

- Count I for breach of contract and the implied covenant of good faith and fair dealing against Zoomcar India;

- Count IV for tortious interference with contract against Zoomcar Holdings and Sternaegis; and

- Count V for declaratory judgment against the Zoomcar Defendants and Sternaegis.

**IT IS SO ORDERED.**

/s/ *Patricia A. Winston*
**Patricia A. Winston, Judge**